# United States Court of Appeals
## For the First Circuit

No. 07-1571

DIMITRULLA JORGJI, PANDELI JORGJI,
and ANGJELLO JORGJI,

Petitioners,

v.

MICHAEL MUKASEY, ATTORNEY GENERAL,

Respondent.

ON PETITION FOR REVIEW OF AN ORDER
OF THE BOARD OF IMMIGRATION APPEALS

Before

Boudin, Chief Judge,

Campbell and Stahl, Senior Circuit Judges.

Gregory Marotta and Law Office of Gregory Marotta on brief for petitioners.
Rebecca A. Niburg, Office of Immigration Litigation, Civil Division, Department of Justice, Peter D. Keisler, Assistant Attorney General, Civil Division, and Jeffrey J. Bernstein, Senior Litigation Counsel, Office of Immigration Litigation, on brief for respondent.

January 24, 2008

**BOUDIN, Chief Judge.** Pandeli and Dimitrulla Jorgji, who are husband and wife, and their son Angjello Jorgji are citizens of Albania. All entered the United States on tourist visas (Pandeli in 2000 and Dimitrulla and Angjello in 2001) which they then overstayed. Pandeli and Dimitrulla each applied for asylum--Dimitrulla in March 2002 and Pandeli in November 2002--and each claimed the other spouse and their son as derivatively entitled to asylum. 8 U.S.C. § 1158(b)(3)(A) (2000); 8 C.F.R. 208.3(a) (2007).

In June 2002 the responsible agency--then the Immigration and Naturalization Service ("INS")--began removal proceedings, 8 U.S.C. § 1227(a)(1)(B). Thereafter, successive hearings were held at which the Jorgjis conceded removability, as they had overstayed their visas, but requested asylum on the ground that they had previously suffered persecution in Albania and reasonably feared persecution should they return.

In hearings before an Immigration Judge, the Jorgjis, of Greek ethnicity and Christian Orthodox religion, sought to show that both Dimitrulla's and Pandeli's families were persecuted in the past for their beliefs--Pandeli's family members largely for their political beliefs and Dimitrulla's mainly for their faith. Also Dimitrulla and Pandeli each said that they observed the killing of villagers who attempted to cross the border from Albania into Greece.

-2-

On August 22, 2005, the Immigration Judge denied the Jorgjis' asylum applications, finding that the applications were untimely under a statutory requirement that asylum applications be filed within one year of the applicant's entry into the United States. 8 U.S.C. § 1158(a)(2)(B); 8 C.F.R. § 208.4(a)(2)(A). Alternatively, the IJ found that Dimitrulla and Pandeli had not shown a well-founded fear of persecution as required by the statute and regulations. 8 U.S.C. § 1101(a)(42)(A); 8 C.F.R. § 208.13(b). The IJ also denied the Jorgjis' requests for withholding of removal and protection under the Convention Against Torture.

The Jorgjis sought review before the Board of Immigration Appeals ("BIA" or "Board"), which, on March 23, 2007, issued a brief affirmance. The BIA said that even if the Jorgjis were found to have timely filed their applications for asylum, their childhood experiences and the persecution of their parents and grandparents "are too remote in time to constitute persecution." The BIA did not further consider the Jorgjis' withholding of removal and CAT claims, which were not properly raised before it.

On review in this court, the Jorgjis argue that at least Dimitrulla's application was timely;[1] they further claim that the

---

[1]Pandeli's application was filed in November 2002, well over a year after his arrival. He blames the delay on the dishonesty or incompetence of his then-counsel but he did not follow the procedure mandated by the regulations, 8 C.F.R. § 208.4(a)(5)(iii), for making such claims and has relied in this court on his wife's application.

Immigration Judge and the Board erred in their assessment of the merits of her persecution claim (and, in the case of the IJ, in the conduct of the proceeding). They have not pursued their withholding and torture convention claims. We begin with the timeliness issue and then turn to the merits and due process issues.

Under the Immigration and Nationality Act an alien must show by clear and convincing evidence that the asylum application was filed with the agency within one year of arriving in the United States, or that the applicant qualifies for an exception to the one-year deadline. 8 U.S.C. § 1158(a)(2)(B). The BIA has the authority to make regulations governing asylum applications. 8 U.S.C. § 1158(a)(1)(B).

Under the pertinent regulations (set forth in an addendum to this decision), the one-year period is calculated from the date of the alien's arrival in the United States; but "[w]hen the last day of the period so computed falls on a Saturday, Sunday, or legal holiday, the period shall run until the end of the next day that is not a Saturday, Sunday, or legal holiday." 8 C.F.R. § 208.4(a)(2)(ii). Dimitrulla entered the United States on March 4, 2001; she mailed her application on Monday, March 4, 2002, and the government received it on March 6, 2002.

Because the agency must ordinarily receive the application within the one-year period, Dimitrulla's application

-4-

might appear to be out of time. But when the application has not been received "within 1 year from the applicant's date of entry . . . but the applicant provides clear and convincing documentary evidence of mailing the application within the 1-year period, the mailing date shall be considered the filing date." 8 C.F.R. § 208.4(a)(2)(ii). Dimitrulla's application would thus be timely if the two regulations can both be applied to a mailed application.

Although the INS attorney did not dispute the timeliness of Dimitrulla's application during the administrative hearing, the IJ concluded that under the regulations, Dimitrulla had to file her application "within one year"; that the filing period ran until Sunday, March 3, 2002, which is one year after entry; and that Dimitrulla had failed to mail her application within the one-year period. The Jorgjis say that this reading is at odds with the language of the regulations excluding Saturdays, Sundays and holidays.[2]

Remarkably, the government argues that we have no authority to review this timeliness determination "because," according to the government's brief, "it rests on factual findings." Under current law, review of factual findings as to

_____

[2]The Jorgjis also argue that since the INS attorney did not dispute timeliness, the IJ's finding to the contrary is a violation of due process rights. But the IJ is not bound by the parties' timeliness determination; the BIA's regulations authorize only asylum officers, immigration judges, or the BIA itself to make determinations regarding the timeliness of an application or whether the pertinent exceptions apply. 8 C.F.R. § 208.4(a)(1).

timeliness is barred but review of legal and constitutional questions is not, as the government brief admits. 8 U.S.C. § 1158(a)(3) (bar on review of findings); id. § 1252(a)(2)(D) (exception for constitutional and legal issues); see also Pan v. Gonzales, 489 F.3d 80, 84 (1st Cir. 2007).

Thus, if there were a dispute about when in fact the applications were mailed or received, the IJ decision would be conclusive. But here the facts are undisputed; and whether the application was timely filed depends solely on how the regulations are read--obviously a question of law. The government, an institutional litigant with a stake in consistent administration of the statute, ought to have more sense than to make such an argument.

The legal issue is perhaps a difficult one. It is quite possible that the drafters of the two provisions did not think about whether they apply cumulatively in a situation like this one. And, if they did think about it, they might have preferred that only one or the other apply, depending on whether the application was filed in person or by mail. The exclusion of weekends and holidays makes good sense as to applications that are filed by hand because most government offices are closed on those days; but nothing prevents anyone from putting a letter in a mail box on a weekend or holiday.

Conversely, the mailing exception treats an application as filed when mailed where the applicant provides "evidence of mailing the application within the 1-year period" and--read independently of the weekend and holiday provision--Dimitrulla plainly did not mail the application within one year of her arrival but instead mailed it on the following day. But the regulation excluding weekends and holidays does not say that it operates only as to applications filed by hand and on a literal reading appears to apply to all applications.

These regulations are addressed to the public--indeed, asylum seekers who may lack counsel when filing--and the literal language supports Dimitrulla's reading, even if a sophisticated reading based on policy might support another outcome. Further, there is no agency precedent for the reading offered by the government's brief and precious little argument in the brief beyond assertion. Indeed, the possible policy argument in favor of the government is not made in the government brief.

Ordinarily, the agency receives deference in construing its own regulations. Sidell v. Comm'r, 225 F.3d 103, 109 (1st Cir. 2000). But whether we have an agency interpretation, as opposed to a litigating position by counsel, is open to doubt: the IJ addressed the issue in a few sentences with no citation to precedent, and the Board bypassed the issue and went directly to the merits. Under these circumstances, we will follow the literal

language, adding that the government would be well advised formally to clarify the regulation language if it prefers its counsel's position to govern in the future.

We turn now to the merits. To be entitled to asylum, the Jorgjis had to establish a well-founded fear of future persecution on one or more of five enumerated grounds (race, religion, nationality, membership in a particular social group, and political opinion). 8 U.S.C. § 1101(a)(42)(A); 8 C.F.R. § 208.13(b); see also Bocova v. Gonzales, 412 F.3d 257, 262 (1st Cir. 2005). A showing of past persecution gives rise to a presumption of future persecution unless rebutted. 8 C.F.R. § 208.13(b)(1); see also Zarouite v. Gonzales, 424 F.3d 60, 63 (1st Cir. 2005).

Remarkably, the government's brief addresses with care the claim that the hearing was procedurally unfair but scarcely addresses at all the substance of the persecution claim beyond reciting (in the statement of facts) the IJ's own analysis. This may be partly explained, but not excused, by the Jorgjis' brief, which only modestly discusses the merits of the persecution issue, concentrating primarily on a claim of alleged unfairness in the IJ's conduct of the hearings.

Nevertheless, the IJ's analysis is quite detailed; the Board's statement is succinct but coherent; and it is up to the applicants to show error. Review of legal rulings is de novo but is deferential as to findings of fact and the determination as to

whether the facts support a claim of persecution. Segran v.
Mukasey, ___ F.3d ___, 2007 WL 4171217, at *2 (1st Cir. 2007);
Toloza-Jimenez v. Gonzales, 457 F.3d 155, 159 (1st Cir. 2006).
Given the standard of review, we think the IJ and Board must be
sustained as to the persecution rulings, reserving for later
discussion the question of procedural fairness.

"To qualify as persecution, a person's experience must
rise above unpleasantness, harassment, and even basic suffering."
Nelson v. INS, 232 F.3d 258, 263 (1st Cir. 2000). Further, the
state must be the source of or at least acquiesce in the
persecution; specifically, the persecution must either be the
direct result of government action or government-supported action,
or there must be some showing that the persecution is due to the
government's unwillingness or inability to control the conduct of
private actors. Orelien v. Gonzales, 467 F.3d 67, 72 (1st Cir.
2006). The persecution need not be personal to the asylum seeker
if it reasonably creates a well-founded fear of persecution in that
person.[3]

Albania, which shares a border in its southeast with
Greece, was from 1944 to around 1990 a repressive one-party state,

---

[3]See Ravindran v. INS, 976 F.2d 754, 759 (1st Cir. 1992)
(citing Arriaga-Barrientos v. INS, 937 F.2d 411, 414 (9th Cir.
1991) (violence against a petitioner's family may establish a well-
founded fear of future persecution if a close link to the
petitioner is shown)); see also Zhang v. Ashcroft, 388 F.3d 713,
718 (9th Cir. 2004).

-9-

harshly Stalinist in ideology. However, following uprisings, Albania has since the early '90s been governed through democratic elections, despite periods of economic and political turmoil. The country is quite poor with much emigration; it is predominantly Muslim but a sizable portion of the population are Roman Catholic or members of the Albanian Orthodox Church.[4]

Dimitrulla's fear of persecution was based primarily on two different sets of incidents. One was the imprisonment of her husband's father and grandfather for their religious and political opinions, primarily their support for the Orthodox Church. The IJ said that Dimitrulla's testimony was generally credible as to specific facts but pointed out that such persecution had occurred over thirty-five years ago and that Dimitrulla "has failed to show a pattern of persecution closely tied to herself simply by testifying that her future husband's father and grandfather were imprisoned for political involvement before she was even born."

In addition to testifying to the difficult "situation and the state of affairs" during her childhood in Albania, Dimitrulla described instances of religious discrimination: the churches in

---

[4]These facts are set forth in the 2004 country report prepared by the State Department and contained in the record. Such reports are the common source of background information in asylum proceedings. See Palma-Mazariegos v. Gonzales, 428 F.3d 30, 36 (1st Cir. 2005) ("The State Department has widely acknowledged expertise in discerning the conditions that prevail in foreign lands. Thus, State Department reports are generally probative of country conditions." (internal citation omitted)).

her town were destroyed by members of the Communist party, and her family was forced to conduct baptisms and other religious practices secretly in their homes. But the Stalinist regime, which was professedly hostile to religion and a self-proclaimed "atheist state" has not been in power for over fifteen years.

Dimitrulla also testified that on three separate occasions in her childhood she had seen people who were killed for attempting the cross the Albanian border and dragged around the village as a warning to others who might flee. But, the IJ pointed out, these incidents had occurred over twenty years ago (when the Stalinist regime was still in power); and in 1991 freedom of travel was restored and "[Dimitrulla] and her husband testified that they have safely and legally crossed the Albanian-Greek border numerous times."

Pandeli, confirming the persecution of his father and grandfather, also said that he had in 1985 witnessed the killing of a youth who tried to cross the border and that he was twice robbed and attacked while crossing the border in 1994 and 1995 by Muslims who harassed him because he was Orthodox Christian. The country report agrees that crime remains a serious problem in Albania, but it also says that religious toleration is widespread, that ethnic Greeks serve in the government, and that the Christian minority freely practice their faith.

In her application for asylum, Dimitrulla said that Albania is dangerous for Greek women because their homes are raided and they are raped; but at the hearing she did not testify at all about any such raids nor describe any personal threats to herself. Further, the IJ noted, she and her husband left and returned to Albania on a number of occasions "and they did not offer any evidence or testimony indicating that their family members [on both sides who still reside in Albania] are currently experiencing harm or persecution in Albania."

We accept that the murders at border crossings that Dimitrulla witnessed in her youth may well have caused her permanent trauma and she may well have genuine fears about living in Albania. But it would be difficult to sustain on this record a finding that Dimitrulla has an objectively reasonable fear of future persecution as specified by the statute, 8 U.S.C. § 1101(a)(42)(A), and in any event no basis exists for finding a lack of substantial evidence to support the IJ's decision that no such reasonable fear has been shown.

The petitioners' brief scarcely attempts to counter the IJ's explanations for discounting their claims that the past incidents show a well-grounded fear of future persecution. Instead, their brief, after reciting some of the testimony, says tersely that the IJ failed to consider cumulatively "all the persecution suffered and further failed to consider that

[Dimitrulla] was denied the right to practice her religion." Neither of these charges appears to be well founded.

All of the main incidents specifically described by petitioners lay well in the past and the regime that fostered them has long since been supplanted. So, insofar as future persecution had to be reasonably feared, the incidents provided no support, whether taken singly or together. Nor did the IJ ignore the claims that the regime had been hostile to religion; the problem was that there was no persecution by the present regime, no claims that Dimitrulla would now be prevented from worshiping freely, and a country report describing a condition of general religious toleration.

Finally, the Jorgjis complain that the IJ compromised the fairness of the hearing and violated their due process rights by operating as a "hostile adversary" by interrupting testimony and directing lines of inquiry from the attorneys. This, the Jorgjis say, reflected an impermissible bias on the part of the IJ and prevented them from developing a complete and detailed evidentiary record. We review de novo the question of whether an IJ's conduct violated a party's due process rights. Ibe v. Gonzales, 415 F.3d 142, 144 (1st Cir. 2005).

After reading the hearing transcripts, we conclude that no infirmity exists. An immigration judge, like all judicial officers, possesses broad but not unfettered discretion over the

conduct of evidentiary proceedings.  See Aquilar-Solis v. INS, 168 F.3d 565, 568 (1st Cir. 1999); 8 U.S.C. § 1229(b)(1) (authorizing the IJ to "receive evidence, interrogate, examine, and cross-examine the alien or witnesses").  The IJ in this case appears to have permissibly used that discretion and to have provided the Jorgjis with a sufficient opportunity to present their case.  In fact, she credited Dimitrulla's specific testimony but disagreed largely as to whether the incidents met the standards for a well-grounded fear of future persecution.

To be sure, the IJ at times interrupted the petitioners' testimony and their counsel's questioning, but seemingly did so to move the case along by preventing repetitive testimony and encouraging the Jorgjis' counsel to focus on especially important issues.  There is no indication of unreasonable restrictions or a failure to allow witnesses to present their full story.  Indeed, an IJ who plays an active role in keeping the focus of the evidentiary hearing sharp "is to be commended, not condemned."  Aquilar-Solis, 168 F.3d at 569.

The Jorgjis' petition for review is denied.

ADDENDUM

The pertinent regulation, 8 C.F.R. § 208.4(a)(2), reads as follows:

One-year filing deadline. (i) For purposes of section 208(a)(2)(B) of the Act, an applicant has the burden of proving:

(A) By clear and convincing evidence that the application has been filed within 1 year of the date of the alien's arrival in the United States, or

(B) To the satisfaction of the asylum officer, the immigration judge, or the Board that he or she qualifies for an exception to the 1-year deadline.

(ii) The 1-year period shall be calculated from the date of the alien's last arrival in the United States or April 1, 1997, whichever is later. When the last day of the period so computed falls on a Saturday, Sunday, or legal holiday, the period shall run until the end of the next day that is not a Saturday, Sunday, or legal holiday. For the purpose of making determinations under section 208(a)(2)(B) of the Act only, and application is considered to have been filed on the date it is received by the Service, pursuant to § 103.2(a)(7) of this chapter. In a case in which the application has not been received by the Service within 1 year from the applicant's date of entry into the United States, but the applicant provides clear and convincing documentary evidence of

-15-

mailing the application within the 1-year period, the mailing date shall be considered the filing date. For cases before the Immigration Court in accordance with § 3.13 of this chapter, the application is considered to have been filed on the date it is received by the Immigration Court. For cases before the Board of Immigration Appeals, the application is considered to have been filed on the date it is received by the Board. In the case of an application that appears to have been filed more than a year after the applicant arrived in the United States, the asylum officer, the immigration judge, or the Board will determine whether the applicant qualifies for an exception to the deadline.