Chief Judge KOZINSKI,
with whom Judges RAWLINSON and BYBEE join,
dissenting:
The majority today holds that aliens seeking asylum have a constitutional right “to testify fully as to the merits of their application.” Maj. op. 890. But constitutional rights, once created, are not easily cabined: If would-be immigrants have a right to testify without limitation in support of their claims, so do untold millions of citizens whose vital interests are at stake in administrative proceedings. Which is doubtless why the Supreme Court has rejected the existence of any such right. Today’s ruling is, in any event, wholly unnecessary because the IJ in this case didn’t preclude petitioner from testifying. The majority manufactures this constitutional melodrama out of whole cloth.
Oshodi submitted copious written materials in support of his asylum application, including medical reports, letters from family and a declaration describing brutal encounters with Nigerian police. At an oral hearing, he called an expert witness, testified under the direction of his lawyer and had a chance to explain adverse evidence offered by the government. The IJ didn’t believe him and explained why: Oshodi’s long history of lying about his identity and the numerous inconsistencies in his testimony. See Appendix. This careful and detailed credibility finding is solid as a rock; we have absolutely no business reversing it.
1. First things first: The IJ didn’t preclude Oshodi from testifying. The majority focuses on a fleeting exchange that took place shortly after Oshodi began his direct examination. Oshodi opened with biographical details, such as his education in Nigeria and his involvement in politics as a student. Impatient that Oshodi’s lawyer was lingering over background material, the IJ encouraged him to cut to the chase:
I’ve read the statements of the respondent, read his application. I’ve gone over the materials. I’m not looking for everything to simply be repeated. I mean I understand that there needs to be testimony concerning [the] application, but if you have something to add to what was there, fine; otherwise, I don’t need it line by line, okay?
Based on this and nothing more, the majority claims that the judge “cut off the direct examination” and “refus[ed] to hear Oshodi’s full testimony with respect to the abuses he suffered in Nigeria.” Maj. op. 887, 891. The majority intones this mantra at least twenty-five times, as if repeating the accusation will make it stick. Maj. op. 885, 885, 886, 887, 887, 888, 889, 889, 890, 890, 891, 892, 893, 893, 896, 897. But if immigration judges (and other judges too, presumably) are constitutionally prohibited from uttering even such tame exhortations, then trials and hearings will become Wagnerian operas where every lit *899 igant can hold center stage until the cows come home.
Judicial time and attention are limited, and feedback about what’s going on in the judicial mind is helpful. The IJ’s statement was no different from what we say to counsel hundreds of times every year: “We’ve read the briefs, so there’s no need to recite the facts,” or “We understand your position on the suppression argument, and we’d like you to focus on the jury instructions instead.” Judges are not potted plants. Giving litigants the kind of guidance that the IJ gave here is an important part of the job, not a denial of due process.
The majority insists that the IJ “barred complete chunks of ... oral testimony,” maj. op. 890 (brackets omitted), but it can’t cite any prohibitory words. The judge didn’t say, “Mr. Oshodi, you may not testify as to anything already addressed in your papers.” He didn’t say, “Testimony will be limited to new material.” Nor did he use the majority’s word, “barred,” or any of its cognates, synonyms or equivalents. Rather, the IJ (1) recognized “that there needs to be testimony concerning [the] application,” but advised Oshodi that (2) he was not “looking for everything to simply be repeated” and that (3) Oshodi was free to add new material. Then he added, (4) “[0]therwise, I don’t need it line by line, okay?” If the judge meant to prohibit repetition of anything in the written application, he would have said so outright or stopped at statement (3). The last phrase makes sense only if the judge expected Oshodi to testify as to material that was already covered in his asylum application.
The IJ’s mild intervention echoed exhortations heard in courtrooms across the country every day: “Move it along, counselor.” If admonitions this mild and innocuous are due process violations, then what can a judge say to a meandering litigant to keep the hearing on track? According to the majority, judges violate the Constitution if they issue any instruction that a litigant or his lawyer might interpret as a refusal to hear testimony. But in a system with a backlog of nearly 30,000 unresolved cases from last year alone, see U.S. Dep’t of Justice, Exec. Office for Immigration Review, FY 2012 Statistical Year Book B2 (2013), we can’t afford to turn every sign of impatience into a constitutional violation, see Aguilar-Solis v. INS, 168 F.3d 565, 569 (1st Cir.1999).
IJs commonly rush aliens through their testimony far more forcefully than the judge did here, see, e.g., Boci v. Gonzales, 473 F.3d 762, 765 (7th Cir.2007), and lawyers have a professional duty to push back if they believe their clients’ rights are being compromised, see Nat’l Immigration Project, Nat’l Lawyers Guild, Immigration Law and Defense § 13.72, at 974 (2012). Nothing the IJ said precluded Oshodi from giving a vivid oral account of the incidents of persecution he allegedly suffered. If his lawyer had any doubts on that score, he could have asked for clarification or made a proffer as to what his client would say. At the very least, he should have objected.
Oshodi’s lawyer chose not to pursue the matter. For all we know, he made a tactical decision, fearing that Oshodi would confuse facts or testify inconsistently with his written statement. See Grava v. INS, 205 F.3d 1177, 1180 (9th Cir.2000) (“Given the difficulties many applicants face at their hearings ... the asylum application sometimes represents an alien’s best case.”). Clients do stumble on occasion, particularly when they’re spinning tales, and Oshodi has a long history of prevarication. His lawyer may have been just as happy to rest on the written submissions.
*900 The majority points to a second instance where the IJ allegedly kept Oshodi from testifying, maj. op. 887-88, but this is pure fantasy. Oshodi’s lawyer asked him to recount an incident where he was beaten by police at a political rally. Rather than answer the question, Oshodi spoke at length about his door-to-door campaign to raise awareness about a tainted election. Understandably confused, the IJ tried to get Oshodi back on track. The majority claims that the IJ precluded Oshodi from responding, but this just isn’t true. Here is the full exchange:
Q: Briefly describe what happened in this encounter with the police.
A: Like I said earlier, we were in the neighborhood called Oshodi, if you can remember, is my last name and is the (indiscernible) of Nigeria. And we were talking to people in the neighborhood sharing political awareness to the people through political material such as posters, flyers, and pamphlets, and we talked to you know, advised people of what was going wrong in Nigeria. Specifically, in 1979 when Shagari won the election,
IJ: Spelling please?
A: SHAGARI. There was, there was an electoral committee that was elected to oversee and write a little portion of the constitution, and there was a decree which specifies that any president from any party must win two-thirds of the votes or could not be elected as a president and the election has to be done over. Unfortunately, this present president, Alhaji Shehu Shagari, only won 12 states and 25% and the 13 states, he only won like 10% of that, which was an illegal election. So my main strategy was to alert the people of Nigeria, especially my community and the chapter to oppose the election. Also in Nigeria, the people—
IJ: Excuse me. Counsel, do you have a specific question for the respondent to answer because right now I don’t know what he’s answering. I don’t think that it was the last question?
Oshodi spent a page of transcript (six fairly convoluted sentences) not answering the question put to him. The IJ pointed this out and asked his lawyer whether he had a “specific question for [Oshodi] to answer.” Rather than restating his question as the IJ suggested, the lawyer passed on to another matter and then abruptly ended his examination. The majority is being unjust in calling what the IJ did an “admonishment” and blaming him for the lawyer’s decision to end the examination. Maj. op. 887-88.
We have long held that judges act well within their discretion when they “participate in the examination of witnesses for the purpose of clarifying the evidence.” United States v. Mostella, 802 F.2d 358, 361 (9th Cir.1986). IJs have not merely the inherent authority of trial judges, but an affirmative duty, imposed by statute, to develop a clear record for appeal. See 8 U.S.C. § 1229a(b)(1); Kaur v. Ashcroft, 388 F.3d 734, 737 (9th Cir.2004); 8 C.F.R. § 1240.11(c)(3)(ii). Oshodi had strayed far from his lawyer’s question, and the IJ tried to bring clarity and coherence to a potentially confusing portion of the transcript. That Oshodi’s lawyer then suddenly ceased questioning Oshodi cannot fairly be attributed to anything the IJ said or did.
The majority’s reading of the record “is yet another tiresome example of the nitpicking we engage in as part of a systematic effort to dismantle the reasons immigration judges give for their decisions.” Kumar v. Gonzales, 444 F.3d 1043, 1056 (9th Cir.2006) (Kozinski, J., dissenting in part) (internal quotation marks omitted). Here the IJ was thoroughly familiar with *901 Oshodi’s written submissions, and wished to focus the hearing on new, important or disputed material. See 8 C.F.R. § 1240.11(c)(3). Instead of praising the IJ’s diligent preparation and careful management of the hearing, the majority chastises him for violating the Constitution. But “an IJ who plays an active role in keeping the focus of the evidentiary hearing sharp is to be commended, not condemned.” Jorgji v. Mukasey, 514 F.3d 53, 59 (1st Cir.2008) (internal quotation marks omitted).
2. But let’s assume that the IJ did what the majority unfairly claims he did. Let’s pretend he told petitioner: “You may not testify as to anything contained in your sworn asylum statement. You may testify as to any new material, and you may then be cross-examined as to your written and oral statements.” Had the IJ done this, which plainly he did not, this would present an interesting constitutional question: Does due process guarantee an illegal alien seeking to remain in the United States the right to present live testimony in support of his petition, or may he be limited to a sworn written statement followed by live cross-examination?
The Supreme Court has spoken directly to this issue: “There is no inexorable requirement that oral testimony must be heard in every administrative proceeding in which it is tendered.” FDIC v. Mallen, 486 U.S. 230, 247-48, 108 S.Ct. 1780, 100 L.Ed.2d 265 (1988). Mallen was the president and a director of a federally insured bank who was indicted, but not yet tried, on various false statement charges. Id. at 236-37, 108 S.Ct. 1780. The FDIC issued an ex paite order suspending Mallen from further participation in the bank’s affairs. Id. at 238, 108 S.Ct. 1780. Mallen requested an administrative hearing where he proposed to present “both oral testimony and written evidence” showing that his “continued service was not likely to pose a threat to the interests of the bank’s depositors or to threaten public confidence in the bank.” Id. The FDIC agreed to a hearing, but “took the position that oral testimony would not be necessary.” Id. at 239, 108 S.Ct. 1780. The FDIC relied on 12 U.S.C. § 1818(g)(3), which provided that the bank officer could “submit written materials (or, at the discretion of the agency, oral testimony) and oral argument.” Mallen, 486 U.S. at 235-36 n. 6, 108 S.Ct. 1780.
Mallen filed suit in district court, claiming that he was denied due process because the administrative hearing did not guarantee him the right to present live testimony. Id. at 239, 108 S.Ct. 1780. The district court rejected the first claim but sustained the second, holding the statutory procedure “ ‘constitutionally inadequate ... because it fails to provide for a hearing at which oral evidence can be presented.’ ” Id. (quoting Mallen v. Federal Deposit Insurance Corporation, 667 F.Supp. 652, 659-60 (N.D.Iowa 1987)). On that basis, it nullified Mallen’s suspension. Id. The government took a direct appeal to the Supreme Court under then-prevailing procedures.
The Supreme Court unanimously reversed. Id. at 248, 108 S.Ct. 1780. It recognized that Mallen’s “interest in the right to continue to serve as president of the bank and to participate in the conduct of its affairs is a property right protected by the Fifth Amendment Due Process Clause,” and Mallen was therefore “entitled to the protection of due process of law.” Id. at 240, 108 S.Ct. 1780. The Court rejected his contention that the statutory procedure “violates due process because it does not guarantee an opportunity to present oral testimony.” Id. at 247, 108 S.Ct. 1780. The Court recognized that there may be “post-suspension proceed *902 ings under § 1818(g) in which oral testimony is essential to enable the hearing officer to make a fair appraisal of the impact of a suspended officer’s continued service on the bank’s security and reputation.” Id. Mallen, however, had not proffered any such evidence to the hearing officer and given him an opportunity to accept or reject it. “For all we know,” the Court explained, “the hearing officer might have accepted such evidence; or if he rejected it, he might have been entirely correct in deciding that it was merely cumulative to material that was adequately covered by written submissions or that it was otherwise unnecessary or improper.” Id. (emphasis added). In reaching its conclusion, the Court cited with approval the three judge district court’s ruling in Feinberg v. FDIC, 420 F.Supp. 109, 120 (D.D.C.1976), which held that such a hearing “does not seem to require any more than written submission.” Mallen, 486 U.S. at 248 n. 13, 108 S.Ct. 1780.
Mallen stands for two propositions that bear directly on our case. First, it holds squarely that due process does not require an opportunity to present live testimony in every case where important property or liberty interests are at stake. At times, all oral testimony can be excluded, not merely direct testimony, as the majority (wrongly) posits happened in Oshodi’s case. Second, the Court states quite clearly that one legitimate basis for precluding the presentation of oral testimony is that the “material ... was adequately covered by [the] written submissions.” Id. at 247, 108 S.Ct. 1780. If the IJ prohibited anything at all here, it was precisely what the Supreme Court in Mallen said it was OK to prohibit.
Mallen is not the only case where the Supreme Court has shown itself reluctant to impose constitutional constraints on administrative proceedings. In Richardson v. Perales, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971), the Court considered whether a hearing officer violated due process by basing the denial of disability benefits on the hearsay reports of nonattend-ing physicians, when those reports were contradicted by the live testimony of a treating physician. Id. at 401-02, 91 S.Ct. 1420. The district court had been “reluctant to accept as substantial evidence the opinions of medical experts submitted in the form of unsworn written reports, the admission of which would have the effect of denying the opposition an opportunity for cross-examination,” and the Fifth Circuit affirmed. Id. at 397-98, 91 S.Ct. 1420. The Supreme Court reversed, emphasizing the informality of Social Security claims procedures and the burden and expense of conducting 20,000 hearings a year. Id. at 400-06, 91 S.Ct. 1420.
The majority purports to read Mallen as “also stan[ding] for the proposition that, in some cases, due process likely requires the admission of oral testimony.” Maj. op. at 895 (citing Mallen, 486 U.S. at 247, 108 S.Ct. 1780). Mallen presents this as an assumption, not a holding, but dismisses it as inapplicable when the oral testimony is “merely cumulative to material that was adequately covered by written submissions,” 486 U.S. at 247, 108 S.Ct. 1780— precisely Oshodi’s situation. Even under the majority’s own reading of Mallen, there is no due process violation here.
But the majority far outstrips even its own optimistic interpretation of Mallen by holding that IJs must allow oral testimony not just in some asylum cases, but in all of them: “[0]ur holding today [is] that due process requires the admission of oral testimony in an asylum and withholding hearing wherein the applicant’s eligibility for relief turns on his credibility.” Maj. op. at 895. Asylum and withholding cases inherently turn on credibility because the peti *903 tioner must persuade the IJ that he will be subject to persecution if he returns to his home country. Oshodi’s case is, in fact, typical: He alleges incidents of persecution and violence directed against him and his family in a distant land, maj. op. 885-87, and seeks to avoid deportation to a country riven by strife, id. at 886, 886-87. My colleagues and I have seen similar claims in countless cases that litter the pages of the Federal Reporter and, even more, the Federal Appendix. See, e.g., Mendoza-Pablo v. Holder, 667 F.3d 1308, 1314-15 (9th Cir.2012); Li v. Holder, 559 F.3d 1096, 1110-12 (9th Cir.2009); Akinshina v. Gonzales, 161 Fed.Appx. 694 (9th Cir.2006); David v. Gonzales, 159 Fed.Appx. 754 (9th Cir.2005); Mashiri v. Ashcroft, 383 F.3d 1112, 1119-21 (9th Cir.2004). The majority opinion here directly contravenes the Supreme Court’s holdings in Mallen and Perales.
Nor can this holding be confined to the immigration context. The majority holds that the Constitution gives would-be immigrants a right to unfettered oral testimony. There’s no credible way we can deny that right to American citizens in the multitude of other administrative contexts that involve credibility. Starting today, anyone in the Ninth Circuit involved in “any contested administrative hearing”-—from the Social Security disability claimant to the unemployment benefits seeker to the zoning applicant—has a right to present full oral testimony without impediment so long as “credibility is a determinative factor.” Maj. op. 889.
By injecting due process where the Supreme Court has said it doesn’t belong, the majority provides a blueprint for the imposition of trial-like procedures on a wide swath of administrative proceedings. All of this disregards the Supreme Court’s steadfast refusal to hold that the procedural protections that attend a trial are necessary to ensure fundamental fairness in administrative hearings. See, e.g., Memphis Light, Gas & Water Div. v. Craft, 436 U.S. 1, 18-19, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978); Bd. of Curators of the Univ. of Mo. v. Horowitz, 435 U.S. 78, 84-86, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978).
The Supreme Court first announced that an alien facing removal is entitled to an “opportunity to be heard upon the questions involving his right to be and remain in the United States” in The Japanese Immigrant Case, 189 U.S. 86, 101, 23 S.Ct. 611, 47 L.Ed. 721 (1903). What kind of hearing did the Supreme Court have in mind? “[N]ot necessarily an opportunity upon a regular, set occasion, and according to the forms of judicial procedure, but one that will secure the prompt, vigorous action contemplated by Congress, and at the same time be appropriate to the nature of the case upon which such officers are required to act.” Id. As far back as 1903, then, the Court made clear that due process in this context can be satisfied with something far less formal than a hearing that conforms “to the forms of judicial procedure.”
To determine whether a particular procedure is constitutionally required in removal proceedings, we must balance the various interests at stake. Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); see also Landon v. Plasencia, 459 U.S. 21, 34-35, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982). The majority begins its balancing in a curious way: by telling us that it’s meaningless because we’ve already found there’s a constitutional right to present oral testimony in removal proceedings. The case that supposedly established this right, Colmenar v. INS, 210 F.3d 967 (9th Cir.2000), found a denial of due process when the IJ announced that he’d made up his mind before *904 the hearing began, “behaved ... as a partisan adjudicator seeking to intimidate,” and refused to allow the petitioner to testify to clearly relevant matters not covered in his written application. Id. at 971. So Colmenar has little in common with our case and, in any event, didn’t engage in a Mathews balancing. It rested instead on a single BIA case that had nothing to do with due process. Id. at 971-72 (discussing Matter of Fefe, 20 I. & N. Dec. 116, 118 (BIA 1989)).
Having already figured out the right answer, my colleagues grudgingly go about showing their work. Under Mathews, we must balance (1) the private interest at stake; (2) “the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional ... safeguards”; and (3) the government’s interest, which includes the burdens imposed by more process. Mathews, 424 U.S. at 335, 96 S.Ct. 893. I’m willing to indulge the majority’s assumption that the first factor weighs in favor of the immigrant, although I rather suspect that many asylum applicants and their lawyers would dearly love to have an excuse to avoid testifying without creating an adverse inference. But the majority’s perfunctory examination of the benefit of additional procedural safeguards and the burden those procedures will impose falls far short of the rigorous analysis we must conduct when determining constitutional rights.
Sufficiency of existing procedures. The existing procedures give the alien substantial protections. The alien first submits a written application for withholding of removal, and then gets a hearing at which he has the right to present evidence; call his own witnesses; and cross-examine adverse witnesses. See 8 U.S.C. § 1229a(b)(4)(B); 8 C.F.R. §§ 1240.10(a)(4), 1240.11(c) (3) (iii). Should he require documents not readily available to him, he may apply to the immigration judge for a subpoena. See 8 C.F.R. § 1003.35(b)(1). He has the privilege of being represented by counsel. See 8 U.S.C. § 1229a(b)(4)(A). After the hearing, the alien may be permitted to submit additional briefing to supplement his file. See Somakoko v. Gonzales, 399 F.3d 882, 883 (8th Cir.2005).
The majority argues that full oral testimony is necessary because “Mathews teaches us” it’s required in “cases that hinge on credibility.” Maj. op. 894. If so, it’s a lesson the Supreme Court has not yet learned. See, e.g., Mackey v. Mon-trym, 443 U.S. 1, 24, 99 S.Ct. 2612, 61 L.Ed.2d 321 (1979) (Stewart, J., dissenting) (decrying majority’s decision not to require a hearing where issues “plainly involve[d] ... credibility and veracity”). Live testimony simply isn’t a constitutional prerequisite to making a credibility determination in an administrative proceeding.
In an effort to prove otherwise, the majority cherry-picks language from a handful of criminal cases. Maj. op. 891. But the cases themselves merely recognize the value of oral testimony in certain narrow contexts. See, e.g., United States v. Thoms, 684 F.3d 893, 903 (9th Cir.2012) (“[A] district court abuses its discretion when it reverses a magistrate judge’s credibility determinations, made after receiving live testimony and favorable to the government, without viewing key demean- or evidence, with one exception....”). Equally unpersuasive is the majority’s assertion that Anderson v. Bessemer City, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) stands for the proposition that special deference is owed a trial court’s credibility determinations because it is best able to evaluate demeanor during live testimony. Maj. op. 892. Anderson, in fact, stands for the contrary proposition: *905 We apply the same deferential standard “even when the district court’s findings do not rest on credibility determinations” because the “rationale for deference to the original finder of fact is not limited to the superiority of the trial judge’s position to make determinations of credibility.” Anderson, 470 U.S. at 574, 105 S.Ct. 1504.
My colleagues are so busy stringing together out-of-context quotes that they overlook that the IJ has other reliable means of assessing credibility. For one, the alien may introduce written evidence to corroborate his declaration, including news accounts, reports from doctors and letters from family and friends. See 8 U.S.C. § 1229a(b)(4)(B). The regulations also require the IJ to place the alien under oath and question him about the truth of his application. 8 C.F.R. § 1240.11(c)(3)(iii). We have long recognized that cross-examination, by both the immigration judge and the government’s lawyer, is a powerful engine for detecting the truth of an alien’s testimony. Indeed, cross-examination is far more important than direct examination. Most people can tell a convincing tale under friendly questioning by their own lawyers, but surviving a stringent cross-examination is what really matters in establishing credibility. See Singh-Kaur v. INS, 183 F.3d 1147, 1151 (9th Cir.1999); see also Abovian v. INS, 257 F.3d 971, 977 (9th Cir.2001) (Kozinski, J., dissental). The statutory right to submit records, coupled with some oral colloquy between the alien and the IJ, guarantees the alien a reasonable opportunity to present evidence bearing on his credibility.
Given the multitude of tools available for the petitioner to establish his credibility and prove up his story, the ability to present live direct testimony during a removal proceeding strikes me as relatively unimportant. Judge Friendly, in his seminal article cited approvingly by the Supreme Court in Mathews, spoke directly to this issue:
I would object to requiring oral presentation as a universal rule. Determination whether or not an oral hearing is required should depend on the susceptibility of the particular subject matter to written presentation, on the ability of the complainant to understand the case against him and to present his arguments effectively in written form, and on the administrative costs.
Henry J. Friendly, Some Kind of Hearing, 123 U. Pa. L.Rev. 1267, 1281 (1975).
Judge Posner, who is no fan of immigration judges, has noted the insignificance of oral testimony in immigration cases:
The fact that [petitioner] was testifying through an interpreter has a significance that my colleagues do not appreciate when they say that “The IJ spent 6 hours in a hearing room, face to face, with [petitioner]. We have never met her.” I take this to be an allusion to the common though not necessarily correct belief that being present when a witness testifies greatly assists a judge or juror in determining whether the witness is telling the truth. Even if so in general, it cannot be so when the witness is a foreigner testifying through an interpreter, especially if the judge cannot even hear the foreigner, but only the interpreter. Reading the facial expressions or body language of a foreigner for signs of lying is not a skill that either we or [the IJ] possess.
Apouviepseakoda v. Gonzales, 475 F.3d 881, 897 (7th Cir.2007) (Posner, J., dissenting).
Whether seeing a witness testify live is critical to judging his credibility is, as Judge Posner says, debatable. The preeminent civil procedure treatise suggests that “[p]erhaps ... the entire American reliance on demeanor is misplaced.” 12 *906 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3070.2 (2d ed.1997); see also Morales v. Artuz, 281 F.3d 55, 61 & nn. 3-4 (2d Cir.2002) (noting empirical studies have refuted belief that “demeanor is a useful basis for assessing credibility”). Observing a witness who communicates through the cumbersome intermediation of an interpreter, or even simply grew up in a different culture, can be downright misleading. See Li, 559 F.3d at 1100 n. 4 (9th Cir.2009) (attributing seeming inconsistencies in an alien’s testimony to “numerous translation difficulties”); Kadia v. Gonzales, 501 F.3d 817, 819 (7th Cir.2007) (Posner, J.) (noting that “immigration judges often lack the ‘cultural competence’ to base credibility determinations on an immigrant’s demean- or”); Dia v. Ashcroft, 353 F.3d 228, 276 (3d Cir.2003) (en banc) (McKee, J., dissenting in part) (“[WJhile the failure to look someone in the eye while speaking is usually interpreted as an indication of deception by people in Western cultures, avoiding eye contact has a very different meaning in some other cultures.”); Chouchkov v. INS, 220 F.3d 1077, 1083 n. 15 (9th Cir.2000) (“[Wjhat sounds peculiar in one country may be the norm in another.”); Barapind v. Rogers, No. 96-55541, 1997 WL 267881, at *2 (9th Cir. May 15, 1997) (holding IJ’s belief that petitioner’s “stoic” demeanor indicated dishonesty was the result of cultural bias). In light of the other mechanisms available to the IJ for detecting whether the petitioner is telling the truth or lying, I can’t say that allowing a petitioner to drone on endlessly, restating every word and every line of his asylum application, is particularly significant to affording him a fair opportunity to present his case.
Burdens imposed by additional procedures. Here again my colleagues disregard what Mathews requires: a full balancing of all of the interests at stake. Instead, the majority asserts the burden on the government is “minimal” because it is merely being ordered to follow “the governing rules and regulations.” Maj. op. 896. What “governing rules and regulations”? The majority cites none. It does cite Matter of Fefe, but that case doesn’t purport to give asylum applicants an unfettered right to testify. See 20 I. & N. Dec. at 118. In Fefe, the BIA “anticipate^]” a thorough examination of applicants in most cases, but established no right to present testimony in every case. Id.
Had the majority given more than cursory attention to this factor, it would have noted that immigration judges decided an average of 1,014 cases each in 2008, a pace that would make any judge’s head spin. See Improving Efficiency and Ensuring Justice in the Immigration Court System: Hr’g Before the S. Comm, on the Judiciary, 112th Cong. 3 (2011) (statement of Karen T. Grisez, Am. Bar Ass’n Comm’n on Immigration). “To produce these numbers, each judge must have issued an average of at least 19 decisions each week, or approximately four decisions per weekday, ... even while assuming no absences for vacation, illness, training, or conference participation.” Id.
Let’s say that the IJ here had decided to manage his Sisyphean caseload by instructing aliens that they could not repeat anything already in their written submissions, but could testify on direct only as to new material, before undergoing cross-examination. Or let’s say that the Attorney General by regulation provided that aliens must submit all of their evidence in writing, and must appear at an oral hearing only to be cross-examined as to the details of their stories. What then?
The Supreme Court has told us that we cannot judge the propriety of any such *907 procedure in the abstract, but must consider the costs and burdens imposed on the system if the IJ is not permitted to follow these streamlined procedures: “[T]he Government’s interest, and hence that of the public, in conserving scarce fiscal and administrative resources is a factor that must be weighed.” Mathews, 424 U.S. at 348, 96 S.Ct. 893. Giving IJs discretion to preclude direct testimony would significantly shorten the time devoted to each hearing and, in the aggregate, considerably speed up the process of adjudicating petitions for immigration relief. It’s easy for us to say, “Let them hire more IJs,” but in this era of cutbacks and sequestrations, when U.S. citizens are feeling the consequences of dwindling federal resources, the government will not ramp up the budget for helping undocumented aliens gain a legal foothold in the United States.
The majority ignores these considerations and merrily piles on more process, but it’s aliens with meritorious claims who will suffer for it. Applicants for asylum and similar relief wait an average of 550 days for a decision from the immigration court, 660 if they’re in California. See Suzy Khimm, Many Immigrants Facing Deportation Must Wait 550 Days For Their Day In Court, WashingtonPost.com (Feb. 22, 2013). These delays are a boon to aliens who make flimsy claims in an effort to forestall their inevitable removal, but they hurt aliens scarred by persecution whose lives are on hold as they wait to secure a future in the United States. While overstating the virtues of oral testimony, my colleagues forget that prompt adjudication of claims is a component of fundamental fairness. See 2 Richard J. Pierce, Jr., Administrative Law Treatise § 9.10, at 894 (5th ed.2010).
3. Even if due process required that an alien be allowed to “testify fully,” as the majority wrongly holds, Oshodi can’t prevail unless he was prejudiced by being denied this right. Cinapian v. Holder, 567 F.3d 1067, 1074 (9th Cir.2009). The majority recites our circuit’s questionable prejudice test, which allows aliens to meet their burdens by demonstrating that “the outcome of the proceeding may have been affected” by the due process violation. Zolotukhin v. Gonzales, 417 F.3d 1073, 1076 (9th Cir.2005). That’s right: Around here, an alien can demonstrate prejudice by showing a mere possibility that the error influenced the result. This is no standard at all. One can seldom say with confidence that a little more testimony would not have affected the outcome. See id. at 1077.
In our circuit, aliens in removal proceedings have an easier time showing prejudice than do criminal defendants, who must demonstrate at least “a reasonable possibility” that the constitutional errors at their trial contributed to their conviction, see Chapman v. California, 386 U.S. 18, 23, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), and a much easier time than habeas petitioners facing execution, who must show such errors had a “substantial and injurious effect” on the verdict, see Brecht v. Abrahamson, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). We have it exactly backwards: Citizens facing loss of life or liberty and the stigma of a criminal conviction should get greater procedural protection than foreign nationals seeking to escape deportation from the United States.
Not surprisingly, our prejudice standard is an outlier among the circuits, most of which require a substantial probability that the alleged due process violation swayed the outcome of the removal proceeding. See Denis v. Att’y Gen. of the United States, 633 F.3d 201, 219 (3rd Cir. 2011) (“substantial prejudice”); Zhou Zheng v. Holder, 570 F.3d 438, 442 (1st *908 Cir.2009) (“likely to have affected the outcome of the proceedings”); Lin v. Holder, 565 F.3d 971, 979 (6th Cir.2009) (“substantial prejudice”); Avila v. U.S. Att’y Gen., 560 F.3d 1281, 1285 (11th Cir.2009) (“would have affected the outcome of the case”). As we are sitting en banc, we should overrule Zolotukhin and bring our standard into line with the majority view.
But Oshodi loses even under our watered-down prejudice standard. The majority speculates that the immigration judge might have found Oshodi credible had he been permitted to testify about the “brutal torture” he suffered in Nigeria. Maj. op. 889. This makes no sense at all. Why would testifying about torture be more believable than testifying about anything else? Oshodi’s testimony was riddled with evasions and inconsistencies, and he had a long record of dishonesty. Additional testimony could do nothing to cure the problems the IJ correctly perceived in the testimony Oshodi had already delivered.
Oshodi claimed to have entered the United States on a business visa, then admitted to entering illegally for a little while before rehashing the story about the business visa once again. He told an immigration officer that he feared persecution in Nigeria because of his “dad’s” political advocacy, but then maintained on cross that it was his “grandad’s” activism that placed him in danger. He claimed to own significant land in Nigeria, then conceded it was not in his name. Oshodi’s brother was sitting in the courtroom, yet, as the IJ noted, Oshodi didn’t ask him to corroborate any of these contested details about his family or personal history. Additionally, Oshodi acknowledged his arrests for passing bad checks, giving false information to a police officer and killing a woman in a drunk driving accident. The IJ was especially troubled that Oshodi was convicted for this last offense under a false name, one of several that he employed, allegedly to avoid detection by Nigerian spies monitoring his whereabouts in the United States. The IJ also pointed to numerous other discrepancies and evasions in Oshodi’s testimony.
The majority sniffs that these inconsistencies concern “peripheral issues,” but my colleagues are stuck in a pre REAL ID Act time warp. The Act permits IJs to assess credibility based on any inconsistency or falsehood, regardless of whether it “goes to the heart of the applicant’s claim.” See 8 U.S.C. §§ 1158(b)(1)(B)(iii), 1231(b)(3)(C); see also Shrestha v. Holder, 590 F.3d 1034, 1043 (9th Cir.2010). The logic behind the statute is the same that animates Federal Rule of Evidence 609(a)(2), which permits impeachment of any witness with past crimes involving dishonesty or falsity, such as passing bad checks and lying to police. Lie once, lie again: If an alien is willing to fudge small details, Congress has said, the IJ may infer he’s also willing to fabricate a history of abuse to avoid removal from the United States. “[A] man with a criminal background [may indeed] also face severe persecution in his home country,” maj. op. 897 n. 15, but a man who is caught telling tales can’t rehabilitate himself by telling more tales. After so much dishonesty, Oshodi could have recounted the torture of Gloucester in King Lear and it would have done him no good.
The rampant inconsistencies in Oshodi’s testimony and his long record of dishonesty and lawlessness amply support the IJ’s adverse credibility finding. See Malkandi v. Holder, 576 F.3d 906, 912 (9th Cir.2009). That’s all we need to know to deny the petition and uphold the agency’s decision.
Today’s ruling impairs the ability of immigration judges to manage their crushing *909 caseload, and benefits fabulists and charlatans at the expense of the real victims of persecution. It disregards Supreme Court precedent and takes a giant step towards importing the Constitution into the realm of administrative procedure. I can’t say precisely where my colleagues’ ill-conceived constitutional venture will end, but it will be nowhere good. I’ll have none of it.
Appendix
The IJ’s credibility findings in Oshodi’s ease:
The Court finds the testimony of the expert witness, Professor James Mitchell, credible and worthy of significant weight. However, although the respondent provided a very detailed declaration as to his claim, is college educated and mature in years, there were numerous contradictory matters and inconsistent statements, as well as omissions from his claim which undermine his credibility. At the onset, the respondent’s acknowledged use of made up false names all cast doubt upon his forthrightness. For instance, the respondent claimed that he informed the court that convicted him of “Vehicular Manslaughter while Intoxicated” of his true name, but yet it is not the name under which he is convicted.
The respondent’s brother was sitting in Court during the entire proceeding, and even though the respondent was represented by counsel, the respondent never called his brother to testify. The respondent surely knew that the entirety of his identity and claimed problems owing to his activities and family were certainly in dispute. Not only did the respondent’s brother not testify, he failed to submit an affidavit. At the very least, the respondent’s brother could have testified as to the respondent’s clan or ethnic tribe, who the respondent’s mother was and her political involvement in Nigeria, who the respondent’s father was and whether he is living or deceased, whether other family members had been granted asylum in the United States as the respondent claimed, and any problems that he may be aware of as experienced by the respondent. These inconsistencies concerning the respondent’s family undermine the respondent’s claim that he is who he says he is.
Other aspects of his testimony undercut his credibility. The respondent complained that he learned a substantial amount of his property was confiscated in Nigeria. Later, the respondent admitted that the properties were not in his name and that the deed was never transferred. The lands are actually part of an estate for his half-siblings.
The respondent also failed to satisfactorily explain whether his father was living or deceased. The testimony of Professor Mitchell seems to indicate that in his conversations with the respondent, that to the best of the Professor’s recollection, the respondent indicated that he is estranged from his father, but that the father is living in southern California. Also, the respondent testified that, in a sworn Q & A with immigration authorities, he claimed he feared harm in Nigeria, not because of his mother as he lists as one of the reasons on his application, but because of his “dad.” This is in conflict with the respondent’s previous testimony, when he stated that his father had no political involvement. In an attempt to explain the inconsistency, the respondent denied that the sworn statement taken by immigration officials was true, saying that the transcription is not in his handwriting, and the only mention *910 during the Q & A was his “grandad” or grandfather. He further explained, that although he admitted to initialing the statement, he was not given a chance to read it. However, the Q & A transcript had been admitted into evidence without objection. In addition, the respondent’s explanation would be undermined, as his asylum application does not cite to his grandfather as a basis for his fear of returning to Nigeria at all.
There were also notable omissions and discrepancies between the respondent’s application and his testimony. The respondent’s application failed to list all ten siblings, and where they live. The respondent expressed confusion because some of his siblings are half-siblings. However, his claim of confusion is undermined, as three of the respondent’s four siblings in the United States are half-siblings, and yet he listed three on his application. The respondent also failed to mention all of his siblings legally in the United States when he was questioned by the Court on February 6, 2006, saying that he had only two brothers and one sister. Furthermore, the respondent did not list any of the siblings out of the United States on his application and he failed to disclose that one sister still lives in Nigeria. These inconsistencies and discrepancies between his testimony and application further undermine his credibility.
Moreover, when the Court asked the respondent about his father, he claimed that his father had regularly come and gone from Nigeria. This statement goes to the heart of at least one aspect of the respondent’s claim, because the respondent indicated that having the family name “Oshodi,” is a clear identifier as to what family he is from, as it is a very prominent name, but not common. His application lists his father as having the same last name. If that is true, and he is living and could come and go from Nigeria without problems, that certainly has a bearing on the respondent’s claim that he would be identified and detained in Nigeria because of his name. Considering that the respondent’s identity is already in question, his overall credibility is undermined by his use of aliases, and his inconsistencies appear as intentional omissions, the Court finds that he should provide evidence that corroborates this testimony.
Decision & Order of the Immigration Judge at 9-11, May 26, 2006.